UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Amy D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50059 |
| | ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, who is now 37 years old, has led a difficult life by her own assessment. She only completed ninth grade, and has worked unsuccessfully in a series of restaurant and factory jobs. For ten years, she has been addicted to heroin and crack, leading to a stay in the Lake County jail and multiple ER visits. R. 648. Along the way, she has lost custody of three children to DCFS and contracted Hepatitis C. However, starting around May 2014, she stopped using drugs and has apparently remained drug-free since then. Also around this time, she began receiving treatment to address long-standing physical and psychological problems. In June 2015, she applied for disability benefits.

After holding a hearing, the administrative law judge concluded that plaintiff was not disabled. The ALJ's decision has two main parts. One is the credibility finding. The ALJ found that plaintiff's testimony was inconsistent with statements she made to doctors and with her activities (such as taking care of her young daughter) and with the fact that she worked in several jobs around the time she filed her application. The other part is the medical opinions. Plaintiff submitted opinions from both doctors and others, but they all were rejected because they were

1

viewed as being inconsistent with the record. The Court concludes that a remand is needed because the ALJ's decision fails to satisfy the basic prerequisites of providing a clear and fair summary of the facts and building an accurate and logical bridge from the evidence to the conclusion. Although the "logical bridge" expression sometimes feels like a cliché, it is still an important metric, as this case illustrates.

## BACKGROUND

The ALJ's summary of the treatment history, though long, does not provide clear timelines regarding the treatment periods for each doctor plaintiff saw from 2014 to 2017, making it hard to tell how frequent she saw them. The parties chose not to include a fact section in their briefs because of space limitations given the numerous arguments being raised. The summary below is only a rough overview intended merely to introduce the key players.

The treatment history begins in the summer of 2014 when plaintiff began court-ordered detoxification. She was then living in Chicago and sought treatment from Heartland Health Outreach – James West Clinic. Her care was overseen by a nurse named Kate Gates, who served as the primary caregiver until late 2016. Ms. Gates diagnosed plaintiff with fibromyalgia and chronic pain syndrome. She also provided two opinions supporting plaintiff's application: (1) a letter dated September 14, 2016 and (2) a three-page Chronic Pain Residual Functional Capacity Questionnaire dated January 11, 2016. Exs. 20F, 23F.

In July 2014, a lumbar x-ray showed that plaintiff had mild lumbar degenerative joint disease. In the fall of 2014, plaintiff began seeing psychiatrist Jessica Weddle who diagnosed plaintiff with anxiety disorder. R. 149. At some point, plaintiff started seeing a new psychiatrist, Dr. Joseph Mason. He diagnosed her with attention deficit disorder and began prescribing Adderall at some point. R. 152. (She had been taking and would continue to take many other

2

medications.) On February 1, 2016, Dr. Mason completed a three-page Mental Impairment Questionnaire in which he opined among other things, that plaintiff had marked limitations in sustaining concentration. R. 961.

In November 2015, Dr. Ailda Nika, a rheumatologist, examined plaintiff and diagnosed her with fibromyalgia. R. 147. Plaintiff only saw him this one time.

Sometime in the late fall of 2016, plaintiff moved from Chicago to Rockford. She stopped seeing Dr. Mason and Ms. Gates and began seeing Dr. Guritzen, her primary care physician. On February 27, 2017, Dr. Guritzen wrote a letter stating that plaintiff was "limited in her ability to work" due to a long list of conditions, including fibromyalgia, sciatica, ADHD, and anxiety. R. 849.

In March 2017, plaintiff saw Dr. Evelyn Otengbediako, a pain management specialist, who prescribed Methadone. R. 154.

In May 2017, plaintiff was pregnant. *Id.*

In July 2017, plaintiff saw Dr. Kohar Jones, a new psychiatrist. *Id.*

In September 2017, the administrative hearing was held. The ALJ first asked plaintiff about the fact that there were two Daniel Browns in the record. Plaintiff explained that one was her significant other, with whom she had an "on and off" relationship for ten years. The other was a friend she met while waitressing and who later hired her to do housecleaning. Both men provided letters supporting plaintiff's application.

Plaintiff testified that she had chronic pain in her knees, back, head, hip, hands, arms, and feet. She stated that relatives came by a couple of times during the week to help out. She stated that her pain fluctuates and is "not as bad" on some days. R. 208. She has taken various medications, prescribed by Ms. Gates, including Amitriptyline, Gabapentin, Lyrica, Cymbalta,

3

and Tramadol. R. 210. The longest she can do physical activities was 30 minutes. After that time, she had to rest, sometimes "for hours," until the pain goes away. R. 211.

The ALJ next asked about recent jobs. The facts about the timing and nature of these jobs are somewhat muddled in this testimony, as well as in the ALJ's decision. The ALJ stated at one point that he was "having to struggle to figure" out these details, suggesting it was plaintiff's fault. R. 214. Plaintiff stated that she worked for a temporary service from November 2014 until May 2015 and worked at a meat factory and a printing company. She "started messing things up" on the printing job, and her employer tried switching her to different jobs within the company but she kept having trouble and needed to take breaks. R. 215-16. Plaintiff then discussed the housecleaning work she did for her friend Daniel Brown. She explained that he was a coffee drinker who often came into the restaurant and offered to help her by hiring her to clean his house. He would just ask her to clean dishes and do a little organizing and would let her have breaks when she wanted. R. 217.

The ALJ then asked about plaintiff's mental health problems. She stated that she had multiple issues making it difficult to stay focused. She would get distracted easily and would sometimes forget what she was saying mid-sentence. R. 219.

On January 31, 2018, the ALJ issued a decision finding plaintiff not disabled. Although the decision is long (at 17 pages), it is not easy to summarize. At Step Two, the ALJ found that plaintiff had the following severe impairments: "attention deficit hyperactivity disorder (ADHD), mood disorder, anxiety, heroin and crack cocaine abuse with methadone maintenance, fibromyalgia, lumbar degenerative joint disease, and thoracic neurofibroma." R. 144.

In the credibility discussion, the ALJ began by evaluating plaintiff's fibromyalgia under SSR 12-2p ("Evaluation of Fibromyalgia"), which sets forth two criteria for assessing whether

4

fibromyalgia is a medically determinable impairment. The 1990 criteria requires a finding of 11 tender points on examination. In analyzing these requirements, the ALJ seemed ambivalent about whether plaintiff truly met the requirements. The ALJ ultimately concluded that the 12-2p requirements had been "established." R. 148. This conclusion rested on Dr. Nika's examination and diagnosis. This would have seemed to settle the matter, but like a backseat driver, the ALJ kept expressing doubts throughout the remainder of the decision about this conclusion and particularly about the tender point findings (more on this below).

The ALJ next summarized the medical record. In this discussion, the ALJ intermittently stopped to draw broader conclusions about plaintiff's credibility. For example, after noting one alleged inconsistency in the record, the ALJ concluded that plaintiff "lacks the ability to provide accurate and specific details." R. 150.

The ALJ then discussed the opinion evidence. The ALJ first gave substantial weight to the state agency opinion in Exhibit 5A. The ALJ stated that this opinion provided the "framework" for the entire decision. R. 154.

The ALJ next considered the non-medical statements. They consisted of the following: a letter from Danny J. Brown (the significant other); a letter from Daniel Brown (friend and employer); a letter from Victor Guevara (supervisor at the printing company); an eight-page questionnaire from Angela Nemeth (plaintiff's sister); and several statements from plaintiff. The ALJ both summarized and dismissed this evidence in the following statement which lumps all the witnesses under the catchall phrase "third party letters and opinions":

> The record includes function reports of the claimant (4E; 8E), her pain report (7E) and third party letters and opinions (9E; 19E; 24E; 25E). These opinions are weighed against the objective medical evidence and treatment records. In the instance case, they merit minimal weight. The longitudinal medical record as a whole contradicts the severity alleged.

5

R. 154.

The ALJ next analyzed the opinions from Ms. Gates and Dr. Mason. The ALJ applied the checklist of factors under the treating physician rule for both and concluded that these opinions deserved minimal (Ms. Gates) or no weight (Dr. Mason). The ALJ relied on similar rationales. The broadest rationale is that both opinions were inconsistent with the overall evidence in the record. (The latter phrase was used often as a talisman to ward off any threatening counterarguments.) Other key rationales were that the objective evidence demonstrated that plaintiff's fibromyalgia was mild and stable; that plaintiff was able to do certain activities; and that she worked some after the alleged onset date.[1]

## DISCUSSION

Plaintiff's primary two arguments for a remand are that the ALJ misunderstood fibromyalgia and erred in evaluating the opinion evidence. The Court agrees with these arguments. In addition, the Court finds that the ALJ engaged in cherrypicking and drew questionable inferences on too many occasions. The impression created after reading the decision is that the ALJ prejudged the case from the outset.

**I.      Fibromyalgia.**

Plaintiff argues that the ALJ misunderstood the "nature of fibromyalgia." Dkt. #17 at 3. Although it is hard to definitively prove this point, the ALJ did fail to acknowledge well-known features of this "complex medical condition." SSR 12-2p.

The main one is that symptoms often wax and wane, with the claimant having "good days" and "bad days." Plaintiff made such an allegation here. Both SSR 12-2p and the case law

---

[1] The ALJ did not analyze Dr. Guritzen's February 2017 letter opinion in this part of the decision. However, in the earlier summary of the medical history, the ALJ stated that his opinion was given no weight because Dr. Guritzen "only had seen the claimant one to two times before he offered the conclusion" and because his opinion was inconsistent with the plaintiff "performing some work." R. 153.

6

emphasize this issue. *See* 12-2p ("For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"); *Heuschmidt v. Colvin*, 2015 WL 7710368, * 8 (Nov. 30, 2015) (the ALJ "failed to note the fluctuating nature of fibromyalgia symptoms that SSR 12-2p describes").

Here, several of the ALJ's key rationales are in tension with this finding. These include the claim that the objective evidence did not support plaintiff's allegations. The ALJ cited to certain doctor visits where plaintiff reported feeling better or where an examination showed mild symptoms or where plaintiff was observed making movements or where she reported doing certain activities. However, such findings, if they are not pervasive, would not necessarily be inconsistent with plaintiff's testimony if her symptoms were truly were waxing and waning as she claims. To cite one example, the ALJ noted that plaintiff's pain exhibited during one doctor visit was inconsistent with another visit five months earlier when she "moved with ease, got out of chair easily, and picked up her child from the floor." R. 154. Perhaps that was on one of her "good days." The decision contains several instances of this type of cherrypicking. It is possible that the good days might become so numerous that they cast doubt on the claimant's allegations. But the record here is hazy. On remand, a more systematic analysis is needed.

Another area in which the waxing and waning nature of this illness might have been relevant is the medical opinions. The ALJ cited to normal examination findings to discredit these opinions. *See* R. 156 (Dr. Mason's opinion is "inconsistent with the many times that the claimant denied anxiety, depression or problems concentrating."). The ALJ also disregarded Dr. Otengbediako's finding of 14 tender points on the ground that it was an outlier compared to other findings such as Dr. Nika's finding of 10 tender points. Put aside whether 14 versus 10 is a

significant difference, this variability could have been attributed to fluctuating symptoms; the ALJ instead construed them as evidence that Dr. Otengbediako's finding was unreliable.

Yet another topic is memory and concentration. The ALJ found that plaintiff's problems in this area were not serious based almost entirely on the fact that she once scored 30 out of 30 on a mini-medical status examination. The ALJ mentioned this finding several times and used it to draw broader conclusions. *See* R. 151 ("The [30/30 score] supports the probability that she minimally could understand, remember or apply simple information, and was unlikely to become distracted, unfocused or incapable of tracking only two to three details at once, as she averred."). The ALJ also cited to this one test as a reason for rejecting the medical opinions. However, if plaintiff's concentration and memory problems fluctuated (and that point has not been definitively established), then this one data point would be weak evidence to support the broad-brushed claim that all of plaintiff's problems, from short-term memory recall to sustained concentration, were unbelievable.[2] Here again, the Court is not claiming to have the final answer, but is merely noting that more analysis and a medical expert's opinion are needed.

Another issue concerning the fibromyalgia is the tender point findings. There are two issues. First, the ALJ confusingly both found that plaintiff met the 12-2p requirements, but then at the same time kept suggesting that plaintiff had failed to meet those same requirements (specifically the tender point finding) and used this as a reason to doubt her testimony. But 12-2p seems to contemplate that the tender point findings are more important for the threshold question of whether the fibromyalgia is a medically determinable impairment, and not as relevant to the later credibility analysis. Second, plaintiff argues that the ALJ made a factual misstatement in

---

[2] As a side point, the Court notes that the ALJ's conclusion that plaintiff's memory and concentration problems were not serious seems at odds with the ALJ's earlier statement in the 12-2p analysis that plaintiff had "consistently" documented "problems in thinking and remembering." R. 149.

8

claiming that plaintiff had "no more than four positive tender points (with a single exception)," the exception being Dr. Otengbediako. R. 155. Plaintiff argues that this claim was "indisputably incorrect" because Dr. Nika, among others, observed 10 tender points. Dkt. #27 at 3.

This Court agrees. The Government responds by attacking a straw man. It argues that the ALJ reasonably could have ignored Dr. Nika's 10-point finding on the ground that it fell just short of the 11 required by the 1990 criteria. Dkt. #26 at 4. But this misses plaintiff's point that the ALJ was factually mistaken. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic"). Although one statement might be forgiven under a harmless error analysis, this misstatement can be added to the list of numerous other reasons for a remand.

## II.  Medical Opinions.

Plaintiff argues that the ALJ's analysis of the medical opinions was flawed in multiple ways. Looking just at the big picture and totaling up the scorecard of opinions, plaintiff's argument begins from a position of strength. On plaintiff's side, there are three individuals (Drs. Mason and Guritzen and nurse Gates) all of whom treated plaintiff and all of whom provided opinions supporting plaintiff's case to one degree or another. On the other side of the ledger, the ALJ relied on one opinion, which was from an unnamed agency psychologist who never treated or examined plaintiff. And, even though the ALJ purported to be relying on the "framework" from this person, the ALJ did not bother to say what that framework was nor discuss any of the rationales from that opinion. Under the treating physician rule, the opinions of the treating physicians, all else being equal, should be generally given more weight based on the idea that they were able to observe the claimant over time, in contrast to the agency psychologist who can only review the cold paper record, to use the old legal adage.

9

Here, the ALJ relied on several rationales to reject the three opinions supporting plaintiff. We discuss several of them below, but two larger problems with the ALJ's overall approach can be noted here. First, the ALJ failed to assess the differing opinions in a consistent way. As this Court has observed, it is important that the ALJ employ the "same metrics" and the "same level of rigor" in evaluating multiple opinions. *Vandiver v. Colvin*, 2015 WL 8013554, *3 (N.D. Ill. Dec. 7, 2015) ("the checklist has its greatest usefulness as a tool for making an apples-to-apples comparison between opinions."). Another way to make this same point is to say that the ALJ did not use any benchmarks to assess the relevant factors. In particular, the most obvious comparison point would be to the state agency consultant. For example, the ALJ criticized the opinions of Dr. Mason and Dr. Guritzen because those doctors had not seen plaintiff frequently enough, in the ALJ's opinion. *See* Dkt. #26 at 7 (noting that Dr. Mason only "performed a medical examination on a few occasions"). Although the number of visits is certainly a valid factor under the checklist, the obvious comparison point is to the agency psychologist who saw plaintiff zero times. The same points apply to the issue of expertise, which the ALJ never considered in relation to the agency consultant whose qualifications are not known.

Second, the go-to rationale used to discredit the treating physician opinions is that they were supposedly inconsistent with the overall record. But how could they *all* be inconsistent with the record, especially if their opinions made up a significant part of that record? This sleight of hand was achieved by using a divide-and-conquer strategy in which each opinion was viewed in isolation and then criticized and called inconsistent with the record. This Court has criticized this approach before, including in at least one case involving this same ALJ. *See Dallosto v. Berryhill*, 2017 WL 4512558 (N.D. Ill. Oct. 10, 2017). The conclusion set forth in *Dallosto* is worth quoting because it applies equally here:

10

> An important point—perhaps the central one justifying a remand—is that, aside from a few relatively minor exceptions, all three medical opinions were *consistent with each other*. This is significant. The ALJ glossed over this fact and instead engaged in a piecemeal divide-and-conquer strategy, examining each opinion seriatim.

*Id.* at *2 (emphasis in original).[3]

In sum, the ALJ failed to consider the cumulative impact of all the opinions, both the medical as well as the non-medical (discussed below). If these opinions had been considered collectively, it would have been more difficult to simply deem them all outliers at the same time.

**III. Non-Medical Credibility Rationales.**

They ALJ relied heavily on two non-medical rationales. However, the analysis in each case was incomplete.

We start with daily activities. The ALJ noted that plaintiff could do various household and caretaking activities. The ALJ relied mainly on short statements taken from the medical notes as the source for determining what these activities involved. Here is a representative description: "Day to day activities consist of household chores, caring for 22 month old and boyfriend and 2 cats. Working out 15 minutes/day." R. 1036. The ALJ believed that these activities were inconsistent with plaintiff's testimony, but it is not clear why there is a contradiction. Plaintiff testified that she could do physical activities in 30-minute segments, but then would have to rest. Why could she not do these tasks in 30-minute segments, all flexibly arranged around her symptoms? The Seventh Circuit has noted this same point. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) ("Carradine does not claim to be in wracking

---

[3] This methodological problem is not limited to just this ALJ. *See, e.g., Brosman v. Berryhill*, 2018 WL 3729320. *5 (N.D. Ill. Aug. 6, 2018) ("Rather than viewing the evidence holistically, the ALJ engaged in a divide-and-conquer strategy in which evidence favorable to plaintiff was cubbyholed and brushed aside with a quick analysis."); *Dorian W. v. Berryhill*, 2019 WL 1572560, *5 (N.D. Ill. Apr. 11, 2019) ("the ALJ never considered the collective force of [] the opinions of Dr. Cole (as well as Dr. Pane, the other treating physician), Ms. Ellis, and plaintiff's wife," all of which were consistent on the broader points).

pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework."); *Hamilton v. Colvin*, 525 Fed. Appx. 433, 438 (7th Cir. 2013) ("We have admonished ALJs to appreciate that, unlike full-time work, the 'activities of daily living' can be flexibly scheduled").

The ALJ also failed to give any serious consideration to plaintiff's testimony that she received significant help from family members. This is another point the Seventh Circuit has emphasized. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (faulting the ALJ for failing to consider that the claimant's ability to live independently was aided by her adult daughter who helped out); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (claimant received help in her daily activities from her husband and other family members).

Plaintiff's testimony was also supported by the statements from her significant other and sister who lived across the street for a time. *See* Exs. 9E, 24E. The sister stated that plaintiff "struggles to take care of herself and [the] baby" and that family and friends help out. R. 448. The sister also generally confirmed other allegations such as plaintiff's forgetfulness. R. 454. Mr. Brown did not directly mention particular activities, but he stated that plaintiff was unable to "concentrate on completing one task" and would repeatedly stop what she was doing to "do something else." R. 495. He also confirmed other allegations such as mood swings, communication problems, and pain complaints. *Id.* These statements were consistent with plaintiff's testimony that she needed assistance from friends and family. The ALJ did not seriously consider these two statements, or the other non-medical statements, and instead dismissed them in lump-sum fashion by asserting that they were all contradicted by the "record as a whole." R. 154. SSR 12-2p recommends that ALJs consider statements from specifically

12

these types of witnesses to substantiate the claimant's subjective allegations. Here, plaintiff supplied these statements, but the ALJ brushed them off with a conclusory dismissal.

There is one other activity that oddly received much attention from both the ALJ and the Government. It is the claim that plaintiff in 2017 took 90-mile "trips" from Rockford to Chicago to see medical providers. The ALJ cited to this fact several times and cited it as a reason to discount the opinion of Ms. Gates. R. 155, 156. The Government described this evidence as being "critical." Dkt. #26 at 6. But the suggestion that this was akin to smoking gun evidence is far from substantiated. First, as a factual matter, it is not clear how exactly how many trips were taken, but it does not appear to be many, perhaps only one. Plaintiff testified that she went to Chicago to sign a release and had to do it in person. R. 221. This sounds like a single trip. Plaintiff also testified that her insurance company provided a transportation service to take her to Chicago. *Id.* So it does not appear that she was driving, a fact omitted from the ALJ's description. It is not clear why riding in a car for 90 minutes was inconsistent with plaintiff's testimony. Second, even if these trips were at odds with plaintiff's normal abilities, it is possible that this was an atypical event in which she exerted herself for important reasons. One could flip this fact into plaintiff's favor by construing these trips as proof that her health problems were serious enough that she was willing to endure a painful 90-minute ride. *See* SSR 12-2p ("If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; *the nature and frequency of the person's attempts to obtain medical treatment for symptoms*; and statements by other people about the person's symptoms.") (emphasis added).

A second non-medical credibility rationale was that plaintiff was "performing some work" around the time she filed her applications. The ALJ mentioned this rationale throughout the decision. It was obviously important, but the factual basis for it is murky. The ALJ relied on tax returns and on vague statements gleaned from the medical notes to conclude that plaintiff was doing fairly vigorous work. The ALJ stated, for example, that plaintiff "worked in a standing job continuously for six months" and that "she filed a 2016 federal tax return suggesting that she was cleaning houses (7D), even if she said it was with accommodations." R. 152.

As vaguely alluded to by the latter phrase, plaintiff described this work in much different terms. She testified that she was unsuccessful in the printing job where she floundered at each job station she was assigned to and was finally let go. As far as the cleaning job, she testified that it involved minimal work and was done under a very flexible arrangement given to her as a favor by Daniel Brown. It was not a full-time job under any conventional definition. Importantly, plaintiff did not just rely on her testimony. She submitted a statement from Victor Guevara, her supervisor at the printing company. He stated that plaintiff struggled with even low intensity tasks, had concentration and back problems while at work, and had to constantly be moved from one position to the next. R. 496. Plaintiff also submitted a statement from Danial Brown who confirmed two facts. First, he observed plaintiff struggling to do the job of being a waitress, noting that she was switched to the night shift in the hope that it would be easier for her, but then was still fired. R. 486. Second, he described the cleaning job at his house. She worked only three days a month and was scattered even on good days and "tended to ramble and lose focus while trying to do a simple task like doing the dishes or dusting the TV areas." *Id.* The ALJ failed to consider these corroborating statements, but they undermine the ALJ's portrayal of plaintiff as an effective worker at these two jobs.

14

**IV.    A Few More Cherries.**

Although the case for a remand is already justified by the above arguments, the Court notes that the ALJ all too frequently engaged in questionable cherrypicking. Several examples have been cited, but the Court will add two more to illustrate the extent of the problem.

**Example #1.** The ALJ stated the following: "Notably, a therapist with Dr. Otengbediako's office offered the claimant free [therapy] services (31F/2). The claimant thanked her for calling, but did not follow up." R. 154. Although the ALJ did not fill in the blank, the insinuation left hanging in the air is that plaintiff's problems weren't all that serious if she had nonchalantly turned down an offer of free therapy. But this description, which might appear reasonable on the surface, is hard to justify after analyzing the source notes. Set forth below is a screenshot of the notes the ALJ relied on:

> Progress Notes by Pozzi, Lindsay, LCSW at 3/20/2017 12:06 PM (continued)
> Amy received a new consult from Dr. Oteng earlier this month. I called her to follow up and offer my services. I spoke with Amy and informed her that I provide free individual therapy for patients that are struggling coping with chronic pain. I also informed her that I offer a free Chronic Pain Support Group. I asked if this is something she may be interested in and she said she was interested, however she has no transportation, no child care and she just has too much going on.

R. 1256. The part highlighted in yellow by the Court was omitted by the ALJ, but it casts plaintiff's decision in a much different and more favorable light. By leaving out this information, the ALJ presented a one-sided picture.

**Example #2.** The ALJ stated the following statement:

> [A]s of November 2014, the claimant self-rated her health with Heartland Health physician Caroline Thurlow, M.D., as "good" (3F/28). It follows that if the claimant felt poorly and was experiencing intense and diffuse 7/10 fibromyalgia pain, as she testified to at [the] hearing, she likely would not have told the physician that her health was "good." The undersigned thus infers that the claimant lacks the ability to provide accurate and specific details[.]

R. 150. The implied accusation is that plaintiff was exaggerating or maybe lying in her testimony. But once again the source material portrays a different, or at least much more nuanced

15

picture. While it is true that plaintiff rated her health as good in response to one question, she also answered the very next question on that same form by stating that she was then in pain. *See* R. 544. The latter answer, which the ALJ omitted, was consistent with her hearing testimony and directly rebutted the inference the ALJ was trying to draw from the first answer. In short, this was not a fair summary by any standard.

*   *   *

The above arguments justify the decision to remand. These arguments were the first set of arguments presented in plaintiff's opening brief. However, at the end of her brief, plaintiff also raised a separate, more novel, argument for remand. She argued that the ALJ who presided over her case was not properly appointed under the Appointments Clause. This argument is based on the Supreme Court's recent decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018). Plaintiff put this argument second in her brief and raised it as an alternative basis for remand. Given this Court's conclusion that a remand is already justified, the Court sees no need to address this potentially time-consuming and complex constitutional question. It can be left for another day or for another court.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: June 8, 2020    By: _____
                         Iain D. Johnston
                         United States Magistrate Judge